EJK:SD
F. #2009R00257

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-10-803**

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

  -against-

XIAO LIN CHEN,
    also known as "Steve,"

and

HAI WU ZHANG,
    also known as "Jack",

           Defendants.

- - - - - - - - - - - - - - - - -X

SEALED AFFIDAVIT AND
COMPLAINT IN SUPPORT OF
APPLICATION FOR
ARREST WARRANT
(18 U.S.C. §§ 371, 545)

EASTERN DISTRICT OF NEW YORK:

      LORENZO D'ANDREA, being duly sworn, deposes and says that he is a Special Agent with United States Immigration and Customs Enforcement, El Dorado Task Force, duly appointed according to law and acting as such.

      Upon information and belief, in or about and between August 2009 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants XIAO LIN CHEN, also known as "Steve," and HAI WU ZHANG, also known as "Jack," together with others, did knowingly and intentionally conspire to import and bring into the United

1

States merchandise contrary to law, and receive, conceal and facilitate the transportation and concealment of such merchandise after importation knowing the same to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

The source of your deponent's information and the grounds for his belief are as follows:

1.     I have been a Special Agent with United States Immigration and Customs Enforcement ("ICE") for over two years and was a Police Officer with the United States Park Police for nine years. I am currently assigned to the Intellectual Property Rights Smuggling Group, which is responsible for investigating crimes such as commercial fraud, smuggling and trafficking in counterfeit goods. During that time period, I have participated in numerous investigations of the foregoing crimes.

2.     This affidavit is based upon my own observations, as well as the following additional sources: (a) surveillance undertaken by myself, other agents and investigators; (b) conversations with cooperating witnesses and reports of other agents and investigators who have had such conversations; and (c) conversations with members of the El Dorado Task Force and other law enforcement agencies. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest, it does not include all of the facts that I have

2

learned during the course of this investigation.  Where the
contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

        3.    As discussed more fully below, this investigation
has revealed that several individuals in the Eastern District of
New York and elsewhere have, among other things, smuggled
counterfeit goods and other merchandise into the United States
and have trafficked in such goods. Customs and ICE officials have
provided samples of the counterfeit goods to investigators of the
actual trademarked companies, who have confirmed that the goods
are counterfeit.

I.  Background

    A.  The Importation of Goods into the United States

        4.    Containers of goods arriving at the ports of the
United States must be granted "entry" or clearance by the
Department of Homeland Security, Customs and Border Protection
(hereinafter "Customs" or "CBP") prior to the goods being allowed
to enter the commerce of the United States. Importers of
containers of goods frequently obtain such clearance through the
use of a "Customs Broker."  A Customs Broker is an individual or
company licensed by Customs to file entry documents for
commercial shipments.  The importer (or agent of the importer)
presents the Customs Broker with certain documents describing the

3

containers, including, but not limited to, Bills of Lading, invoices and packing lists. The Customs Broker provides Customs information from those documents in order to obtain Customs clearance.  Statutes and regulations governing the importation process require that the information provided to Customs be truthful and complete.  See  18 USC §§ 541 and 542 and 19 USC §§ 1431, 1433 and 1592.

        5.    Based on the information provided on the shipping documents and application for entry, Customs may clear a particular container or shipment without inspecting it.  Indeed, the large volume of cargo arriving at the ports each day prohibits Customs from examining every container or shipment prior to Customs release.  Customs will target certain containers and air shipments for review and, on some occasions, will randomly examine shipments.  If and when Customs clears a container, Customs informs the Customs Broker who, in turn, informs the importer that the container has been cleared.  After a container is cleared, it may be removed from the port and delivered to the importer or its customer.

        6.    Instead of clearing a container, Customs may place a hold on it.  By placing a container on hold Customs is communicating to the shipping line that the container should not be released because Customs has an interest in the container. Customs may place a variety of types of holds on a container,

4

including agricultural holds, manifest enforcement holds or contraband enforcement team holds.

II.   The Current Investigation

A.   The Nature of the Defendants' Conspiracy

7.   The investigation has revealed that the defendants conspired to unlawfully import containers of counterfeit goods from China into the United States.  As part of the scheme, the defendants would provide fraudulent shipping container documents, specifically fraudulent Bills of Lading, to a Customs broker.  The Customs broker, relying on the information provided in the Bill of Lading, would then arrange for the release of containers.

8.   Between August 2009 and the present, the defendants conspired to smuggle a number of containers into the United States.  On three such occasions, the defendants provided false Bill of Lading documents to undercover agents with ICE (hereinafter the "UC").  ICE delivered the three containers to the defendants but seized samples from each of the three containers, all of which contained counterfeit goods, including handbags and sneakers.

B.   The Offense Conduct

9.   On or about August 25, 2009, a store owner, acting as a confidential source (hereinafter "CS") informed ICE agents that the defendant, HAI WU ZHANG, also known as "Jack", along

5

with another individual, were looking for his/her assistance with
the smuggling of counterfeit goods into the United States.   ICE
agents directed the CS to provide ZHANG with the contact
information for "Jay," who was actually an undercover ICE agent.

10.   On or about September 17, 2009, ZHANG
contacted "Jay," and they agreed to meet at "Jay's" office in
Queens, New York on the same day.  Some time later, ZHANG arrived
at "Jay's" office along with the defendant, XIAO LIN CHEN, who he
introduced as his business partner.  Another undercover ICE
agent, "Agnes," also attended the meeting.  ZHANG and CHEN
explained that they were having trouble with the release of
Container MSKU9429579 ("Container 1"), which Customs had placed
on hold for an exam.

11.   CHEN mentioned that the contents of the container
included furniture and handbags like "Gucci", "Coach" and "Coco."
"Jay" asked if the goods were fake, and both ZHANG and CHEN
answered in the affirmative.  CHEN stated that he and ZHANG would
pay $55,000 USD for assistance in getting Container 1 released.
CHEN stated that Container 1 should be delivered to a warehouse
in Queens, New York.

12.   CHEN also stated that he had another container,
Container TGHU9059239 ("Container 2"), en route to the United
States and that he would provide the Bill of Lading to "Agnes."
CHEN stated that Container 2 contained approximately 280-300

boxes of handbags. Ultimately, ZHANG and CHEN agreed to pay "Jay" and "Agnes" a fee of $55,000 to get both Containers 1 and 2 released into the United States.

13. On or about September 29, 2009, ZHANG and CHEN met with "Jay" in Queens, New York and gave him the Bill of Lading documentation for Container 1 and Container 2 and a down payment of $10,000. The Bill of Lading for Container 1 stated that Container 1 held 824 cartons of furniture, and the Bill of Lading for Container 2 stated that Container 2 held 1,156 cartons of furniture. CHEN also provided "Jay" with the address for the delivery of the containers. "Jay" and both defendants agreed that Container 2 would be delivered the following day, October 1, 2009.

14. On or about October 1, 2009, Container 2 was delivered to the address provided by CHEN and ZHANG. Prior ro the delivery, ICE agents examined the container and determined that it held approximately 300 cartons of counterfeit Coach brand handbags. "Jay" accepted $45,000 from CHEN.

15. On or about October 8, 2009, CHEN called "Agnes" to ask about the delivery of Container 1. "Agnes" informed CHEN that Customs had seized Container 1 and it could not be returned. In fact, on or about September 18, 2009, Customs and Border Protection officers had seized Container 1 and determine that it contained approximately 13,020 counterfeit Gucci handbags, valued

7

at approximately $69,960 retail.

16. On or about October 20, 2009, CHEN gave a
confidential informant a $15,000 deposit in an attempt to secure
the delivery of Container MSKU8768475 ("Container 3").  The Bill
of Lading provided for Container 3 stated that it contained 582
boxes of sports shoes.

17. On or about December 11, 2009, "Agnes" met with
ZHANG in Queens, New York.  ZHANG gave "Agnes" an additional
$20,000 for the delivery of Container 3.

18. On or about December 15, 2009, ICE Agents acting in
an undercover capacity delivered Container 3 to the address given
by ZHANG.  "Agnes" collected $40,000, the balance for the
delivery, from ZHANG. Container 3 contained approximately 9,312
pairs of counterfeit NIKE Air Force sneakers.

19.  On or about January 27, 2010, "Agnes" met with
CHEN.  CHEN advised "Agnes" that he had two containers on hold,
Container MSKU0134052 ("Container 4") and Container MSKU0979928
("Container 5") and needed her help to get them released. CHEN
stated that one of the containers held only furniture and the
other held both furniture and handbags. CHEN faxed a Bill of
Lading and Arrival Notice to "Agnes's" fax machine.  The Bills of
Lading for both Containers 4 and 5 stated that they contained
furniture.

20.  Customs and Border Protection officers seized

8

Container 4 and determined that it contained 9,450 Coach brand
handbags with a retail value of approximately $28,620 and
Container 5 which contained 8,640 Louis Vuitton handbags with a
retail value of approximately $25,920.

21.  On or about February 1, 2010, "Agnes" called CHEN
and explained to him that she would not be able to secure the
release of Container 4 and Container 5.

22.  On or about June 10, 2010, "Agnes" received an
email from CHEN stating that two containers would be arriving in
Newark, New Jersey in July, 2010.  Container GESU5442720
("Container 6") would be arriving on July 8, 2010 and Container
PONU8064882 ("Container 7") would be arriving on July 11, 2010.
CHEN furhter stated that both containers contained counterfeit
handbags. CHEN stated that he would pay "Agnes" $35,000 for
securing the delivery of each container.

9

III.    CONCLUSION

          WHEREFORE your deponent respectfully requests that
arrest warrants be issued for XIAO LIN CHEN, also known as
"Steve," and HAI WU ZHANG ZHANG, also known as "Jack," so that
they may be dealt with according to law.

          FURTHER, your deponent requests that the Court order
that this Affidavit, as well as the arrest warrants issued
pursuant to this Affidavit, be sealed until further order of the
Court.

                                        Lorenzo D'Andrea
                                        Special Agent, ICE

Sworn to before me on this 14th
day of July, 2010


                              10